UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Case No. 1:05CR 43 CDP
                                    )
THOMAS J. FARQUHAR,                 )
                                    )
            Defendants.             )

## REPORT AND RECOMMENDATION

The defendant, Thomas J. Farquhar, is charged with Being a Felon in Possession of Firearms and Ammunition.  He filed two pretrial motions: Motion to Suppress Statements (Document #16) and Motion to Suppress Evidence (Document #16).  The government filed its responses.  Following an evidentiary hearing, the parties filed memoranda.

The court has found the parties' memoranda very helpful in setting out the issues, their positions on the issues and the law supporting their positions.

## Facts

On August 23, 2003, East Prairie Police Officer Paul Meacham was contacted by Amy Farquhar.  Mrs. Farquhar reported that she was married to Thomas Farquhar and that they resided at 706 O'Bryan Street in East Prairie, Missouri.  Mrs. Farquhar said that she had been involved in a confrontation with her husband and that he had threatened to shoot her with a firearm.  Meacham helped Mrs. Farquhar obtain an order of protection.  During the

interview, Mrs. Farquhar told Meacham that Thomas Farquhar had firearms in their house and that he was on parole.

Mrs. Farquhar and Meacham went to the Farquhar house. She showed Meacham a gun cabinet in a bedroom that she claimed contained firearms. The cabinet was locked and the doors were solid, keeping the contents from view of the officer. Mrs. Farquhar said that there was normally a key to the cabinet at the home, but the key was missing at this time. Mrs. Farquhar showed Meacham the place where the key was normally kept.

About this time, Thomas Farquhar returned to the residence. He requested that Mrs. Farquhar get her personal belongings and leave the house. Meacham informed Farquhar about the order of protection. Farquhar obtained some of his personal possessions and then left. Meacham also left the house.

Meacham contacted Missouri State Highway Patrolman R. W. Eakins concerning the information that Mrs. Farquhar had provided about the firearms. Both Meacham and Eakins went back to the Farquhar residence around 3:30 P.M. They made contact with Mrs. Farquhar. Amy Farquhar signed a written consent to search form. The officers asked her if they could take the gun cabinet and some ammunition that was in the same room. Mrs. Farquhar agreed. The officers took the gun cabinet and ammunition back to the police station. The cabinet was still locked.

Eakins then called Thomas Farquhar at his grandmother's residence. Eakins asked if he could speak with Farquhar. Mr. Farquhar agreed.

Eakins drove to the grandmother's house at 279 County Road 357, Charleston,

Missouri.  He arrived around 4:45 P.M.

Farquhar immediately asked Eakins if he was going to arrest him.  Eakins said that he was not going to arrest him at that time.  Farquhar said that he was nervous about the reason for the conversation.

Eakins asked if Farquhar was still on parole.  He said he was.  Eakins asked if Farquhar was supposed to be in possession of any firearms.  Farquhar admitted that he wasn't and that he had some firearms in his house in a gun cabinet.  He also said that the key to the gun cabinet was in a hidden jar in the house and that Mrs. Farquhar knew where the key was.  Farquhar said that he did not have the key, but his father had a second key.  Eakins asked if the firearms in the cabinet were his.  Farquhar admitted that they were.  Farquhar denied threatening to shoot Amy Farquhar or that he had been hunting the previous Friday.  Farquhar said that he shouldn't have had the firearms that were found inside the house.  He also said that he didn't think that would hurt anything so long as he did not have the gun cabinet key.

Eakins asked Farquhar if he could search his truck which was parked in the driveway.  Farquhar consented to the search.  Eakins found a box of Federal brand .22 caliber ammunition in the truck.  The box contained 42 rounds of ammunition.  That ammunition was seized.

Eakins asked Farquhar what he was doing with the ammunition in the truck.  Farquhar told the officer that his friend, Ennis, gave it to him.  Eakins asked if Farquhar would come to the East Prairie Police Department at 10:00 A.M. to let the officers in the gun cabinet.  He

said he would.

No <u>Miranda</u> warnings were given during this conversation.

The next day, Thomas Farquhar and his father, William Farquhar, came to the police station. William Farquhar provided a key for the gun cabinet. It was opened. The cabinet contained two handguns, five shotguns and two rifles. These firearms were seized. They are listed in the indictment.

Meacham asked Thomas Farquhar if he would talk with him about the firearms. He agreed to do so. Meacham read the <u>Miranda</u> warnings to Farquhar. The timing of the reading of the warnings is in controversy. Farquhar also signed a waiver of rights form. Meacham asked questions similar to those posed by Eakins. Farquhar admitted that he owned the firearms in the gun cabinet and that he possessed the .22 caliber ammunition found in his truck.

Both Eakins and Meacham observed Farquhar during their contact with him. Farquhar appeared to fully understand their questions and gave appropriate answers. Farquhar appeared to be fully competent during all contacts with any officer.

The interview was then terminated. No other evidence was seized.

### Discussion

As noted earlier, after the evidentiary hearing, the parties filed memoranda setting out their positions with regard to the searches and seizures involved in this case and the interrogations of the defendant.

The defendant's first contention is that the removal of the gun case from the

defendant's residence was without a search warrant or valid consent and, therefore, the weapons contained in the gun case should be suppressed. The defendant, in his Memorandum (Document #22), summed up his position in the following words, "Thus, the questions come down to whether Amy Farquhar had legal authority to consent to the search and seizure."

Any person with common authority over, or other sufficient relationship to, the place or effects being searched can give valid consent. United States v. Matlock, 415 U.S. 164, 171 (1974); Frazier v. Cupp, 394 U.S. 731, 740 (1969); United States v. Moran, 214 F.3d 950, 951-52 (8th Cir. 2000).

As the wife of the defendant and as one living in the home, Amy Farquhar certainly had access to a spare bedroom which was apparently being used for storage. She had gone to the East Prairie Police Station seeking protection. She told about the threat by her husband, that he should get his gun out and use it. She also stated there was a gun case in the home that had a lot of guns in it. She also told the officers that her husband was on parole and he was not supposed to have guns at their home. Mrs. Farquhar received a Full Order of Protection which stated that she was to have custody of the parties' child, was to stay at the residence and Mr. Farquhar was to leave the residence. By the time the Order of Protection was issued, Mrs. Farquhar had left the police station. Officer Meacham went back to the residence of the defendant and Mrs. Farquhar to serve the Order of Protection on Mrs. Farquhar. While Meacham was at the home, Mr. Farquhar returned. Thomas Farquhar asked the officer to have Amy leave because "he pays the bills." Officer Meacham explained

to Mr. Farquhar, while serving a copy of the Full Order of Protection on Mr. Farquhar, that the court document required that Mr. Farquhar leave and Mrs. Farquhar is to stay in the residence. Mr. Farquhar got some of his belongings and left.

Officer Meacham said that while he was at the home, he saw the gun safe and asked Mrs. Farquhar if she had a key for it and if officers could look into the gun safe. Mrs. Farquhar replied that yes, there was a key, she went to the kitchen area but the key was gone. At that point, Officer Meacham went back to the police station and called Trooper Ron Eakins and asked Trooper Eakins to come down and help Officer Meacham.

Accompanied by Trooper Eakins and a Lieutenant John Gifford of the East Prairie Police Department, Officer Meacham went back to the Farquhar home. Officer Meacham asked Mrs. Farquhar if the officers could take the safe until they found out what was in it and Mrs. Farquhar agreed that the officers could take the gun safe. The case was a green metal gun case and the officers could not see through the doors. Officer Meacham then called the Prosecuting Attorney for Mississippi County and asked her if he had a legal right to take the safe, and the Prosecuting Attorney replied that if the owner of the home says it's okay, then they could take it.

At the evidentiary hearing, Trooper Eakins testified that he went over the same story as Mrs. Farquhar had given to Officer Meacham. She told Eakins she wanted the officers to take the firearms out of the residence that were Thomas Farquhar's. She pointed to a bedroom as the place where the weapons were located. Eakins said there were numerous items of ammunition on a table to the right of the gun cabinet or safe. Mrs. Farquhar told

the officers they could take the guns and the ammunition. Eakins testified there was supposed to be a key hidden in a jar, but the key was not in the jar when Mrs. Farquhar went to get it.

Trooper Eakins obtained a written Consent to Search the home, including "spare bedroom, all ammo, and brown cabinet/gun safe." It was signed by Mrs. Farquhar. The Consent to Search form also contained the following statements: "I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form;" "I further state that no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form." The form was dated and contains the signatures of Trooper Eakins as a witness and Mrs. Farquhar.

The officers confiscated the ammunition that was in the same room as the gun safe.

In her written statement the next day, Mrs. Farquhar confirmed that she had given the officers permission to get the gun cabinet and guns.

The defendant seems to be taking the position in his post-hearing memorandum that the gun case containing the weapons was actually owned by William Farquhar, the defendant's father, and, consequently, neither Mr. Thomas Farquhar nor his wife, Amy Farquhar, had the right to consent to the removal of the case. As the government points out in its memorandum filed after the evidentiary hearing, the defendant cannot claim that evidence should be suppressed if another person's (William Farquhar's) constitutional rights had been violated by a search and seizure.

One of the defendant's arguments is that Amy Farquhar did not have authority to consent to the search of the home or the safe because she was not the legal owner of the home. The Supreme Court in United States v. Matlock, 415 U.S. at 171, 94 S.Ct. at 993, n. 7, rejected such an argument based on legal title:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, (citations omitted) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Mrs. Farquhar was a co-resident in the home, whether she had actual legal title or not, and had access to the bedrooms of the home, even one which was being used for storage. She had access to the gun safe in that she knew where the key was in the kitchen, had access to the key, and went to get it but it was gone. She wanted the weapons out of the house. Mrs. Farquhar had told Officer Meacham that Mr. Farquhar was on parole and was not permitted to have weapons. The safe contained evidence of a crime. The officers had checked with their legal authority, the Prosecuting Attorney, to see if they could legally seize the gun safe and were told they could.

Later, William Farquhar, the defendant's father, claimed that the weapons were his own and not those of the defendant. He changed his statement a bit, as noted later. Mrs. Farquhar told the officers that the guns were her husband's. The officers, at the time they seized the safe, did not know of Mr. William Farquhar's claim.

In Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, two detectives went to the defendant's home and spoke to his wife. They asked Mrs. Coolidge if her husband owned any guns. Mrs. Coolidge said yes and she would get them in the bedroom. Mrs. Coolidge took four guns out of the closet and gave them to the officers. The policeman then asked Mrs. Coolidge what her husband had been wearing on the night of the disappearance of the victim. She produced four pair of trousers and indicated that her husband had probably worn either of two of them on that evening.

Mrs. Coolidge described her own motive as that of wanting to clear her husband because she believed that she had nothing to hide. The Supreme Court held that there was no unconstitutional search and seizure involved in the officers' receiving the weapons and defendant's clothes.

From every piece of information which the officers had at the time they took the gun safe, Mrs. Farquhar appeared to have authority to give consent to the removal and search of the gun case. Even if it turned out later that Mrs. Farquhar did not have authority to grant consent, and this court does not find that that is the case, the Supreme Court in United States v. Rodriguez, 497 U.S. 177, 110 S. Ct. 2793, held that if the officers acted as reasonable men, there would be no constitutional violation. 497 U.S. at 186, 110 S.Ct. at 2800, citing Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311. The Rodriguez court continued:

> We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search. Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement

officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably. The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape. See Archibald v. Mosel, 677 F.2d 5 (CA 1 1982).

Id.

The Rodriguez court summed up its finding as follows:

As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

Id. at 188-89, 110 S.Ct. at 2801.

In United States v. Moran, 214 F.3d 950, the Court of Appeals for the Eighth Circuit held that delivery of a tin box containing dynamite and other contraband belonging to the defendant to investigating officers was proper. Ms. Johnson, the owner of the trailer home where Moran lived, gave the officers consent to search her trailer. When the officers went into a bedroom shared by Ms. Johnson and Mr. Moran, the defendant, Moran, remained in the living room and offered no objection to the search. When Mr. Moran argued on appeal that the officers had no good reason to believe that Ms. Johnson had authority to consent to the search of his tin box in the closet of the shared bedroom and that the apparent-authority doctrine was not applicable, the Court of Appeals responded, "We deem it unnecessary to

pursue the intricacies of property and agency law. The question is whether the search was 'unreasonable' within the meaning of the Fourth Amendment, and we are convinced that it was not." The Court continued:

> It is not disputed that Ms. Johnson freely gave consent, and that she owned the house trailer, including the bedroom. The tin box was not identified in any way as belonging to Mr. Moran, nor did Mr. Moran attempt to limit Ms. Johnson's consent to her own personal property. It was reasonable, as that term is used in Fourth Amendment law, for the officers to think that the tin box was within the consent that Ms. Johnson had given. It was also reasonable for the officers to think that Ms. Johnson had authority not only over the premises, as real estate, but also over all of their contents not obviously belonging to someone else. To put it another way, when Mr. Moran placed his possessions among those of Ms. Johnson in a home owned by her, without segregating or labeling them in a clear way, he assumed the risk that someone acting under authority granted by Ms. Johnson would, without deliberately intending to do so, gain knowledge about his own possessions. See Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Id. at 951-952.

The court finds the seizure of the gun case and weapons contained in the gun case as well as the loose ammunition found in the same room as the gun case was legal and in accordance with the defendant's rights. The weapons and ammunition are admissible in evidence and should not be suppressed.

### Trooper Eakins's Interrogation and Search of Defendant's Vehicle at the Defendant's Grandmother's Home

The interview of the defendant at his grandmother's house was conducted by Trooper Eakins on Saturday, August 23rd, 2003. Trooper Eakins called Thomas Farquhar at his grandmother's home and asked if he could come and talk to him. Mr. Farquhar said he

could. Trooper Eakins was in his Missouri State Highway Patrol uniform and had his pistol at his side in a holster. Trooper Eakins had obtained the grandmother's address from the defendant's probation and parole officer.

When Trooper Eakins called the defendant at his grandmother's house, he told the defendant that Trooper Eakins needed to speak with him. Mr. Farquhar told the trooper to come and gave him the address. The conversation first took place on the porch of the grandmother's home and then it moved out into the front yard. Trooper Eakins testified that he did not restrict Mr. Farquhar's movements in any way. He did not place Mr. Farquhar in handcuffs. Eakins told the defendant that he was under investigation and that was the reason the trooper was there. Mr. Farquhar asked if the trooper was going to arrest him and Trooper Eakins said no, not at that time. No <u>Miranda</u> warnings were given. In the conversation that followed, Trooper Eakins asked Mr. Farquhar if he was still on parole and Mr. Farquhar told Trooper Eakins he was. Mr. Farquhar acknowledged that he was not supposed to be in possession of firearms. He admitted that he had firearms in a gun cabinet but it was locked. Thomas Farquhar told Eakins he did not have the key and did not think it was a problem for the firearms to be at his residence. Mr. Farquhar told Trooper Eakins that there was supposed to be a key in the jar at the Farquhar residence, which is the same spot Amy Farquhar said it would be. Thomas Farquhar said there was a second key and his father had it. Trooper Eakins asked Mr. Farquhar if he could search Thomas Farquhar's truck and make sure there were no guns or anything illegal that Mr. Farquhar was not supposed to have. Thomas Farquhar told the trooper he could search the truck. The trooper

found a box of .22 caliber shells in the truck. The defendant explained that a friend of his by the name of Ennis was getting rid of the ammunition and gave the shells to him.

When asked about Mr. Farquhar's demeanor, Trooper Eakins explained that "he was just nervous 'cause I was talking to him but towards me he was just talking to me like normal." Mr. Farquhar's answers were appropriate to the questions asked; he appeared to understand the questions. The trooper could not smell any intoxicants on the defendant's breath. The tone of the trooper's voice was conversational and was not raised. The trooper did not make any threats to Mr. Farquhar nor any promises.

There is no question that, on the occasion of the interview of Thomas Farquhar by Trooper Eakins at the grandmother's, no <u>Miranda</u> warnings were given. There was interrogation as Trooper Eakins inquired about the defendant's parole status, his possession of weapons and whether Thomas Farquhar knew that he should not possess weapons.

The defendant contends that Thomas Farquhar was in custody when he was at his grandmother's home and as a result, <u>Miranda</u> warnings were required. In <u>Thatsaphone v. Weber</u>, 137 F.3d 1041( 8th Cir. 1998), the Court of Appeals for the Eighth Circuit held as follows:

> "<u>Miranda</u> warnings are due only when a suspect interrogated by the police is 'in custody'." <u>Thompson v. Keohane</u>, 516 U.S. 99, 102, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995). In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Stansbury v. California</u>, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-29, 128 L.Ed.2d 293 (1994) (quotations omitted).

Id. at 1044.

The Eighth Circuit quoted from <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977), 97 S.Ct.

711, concerning custody:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it.... But police officers are not required to administer <u>Miranda</u> warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. <u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which <u>Miranda</u> by its terms was made applicable, and to which it is limited.

429 U.S. at 494, 97 S.Ct. at 714.

<u>Thatsaphone</u>, 137 F.3d at 1044-1046.

It is important to remember the circumstances surrounding the interview at the

defendant's grandmother's home. When the defendant was ordered to leave his residence in

accordance with the Order of Protection, it is assumed he went to his grandmother's as a

place to stay. This is where he chose to go and normally at such a place would feel at home.

The interview took place on the porch and in the front yard. Trooper Eakins asked

permission to come see him. Obviously, there was interrogation. There is no indication of

any type of coercion. The defendant asked whether he was going to be placed under arrest

and he was told not at this time. The trooper had told Thomas Farquhar that he was under

investigation. Although the defendant was nervous, as the Supreme Court in <u>Oregon v.</u>

<u>Mathiason</u> stated in the portion just quoted, "Any interview of one suspected of a crime by

a police officer will have coercive aspects to it.... But police officers are not required to

administer <u>Miranda</u> warnings to everyone whom they question." The nervousness may be attributed to the fact that a police officer was interviewing the defendant who was told openly and candidly that he was a suspect in a crime. In their memoranda, both parties cited <u>United States v. Griffin</u>, 922 F.2d 1343 (8th Cir. 1990), in their analyses of the issue of custody and the parties came to different conclusions.

Using the format of <u>Griffin</u> as both parties did, the court would make the following findings: 1. The defendant was told that he was not under arrest. 2. The defendant possessed unrestrained freedom of movement during questioning. Trooper Eakins and Mr. Farquhar moved from the porch to the front yard in the seemingly relaxed situation at the defendant's grandmother's home. The grandmother was present but did not take part in the conversation. 3. Mr. Farquhar was contacted by Trooper Eakins and did not initiate the contact, but he did tell Eakins he could come, voluntarily agreed to respond to questions and spoke freely. The defendant made several admissions, such as possession of firearms, that the firearms in the gun case were his, but he also felt free to deny threatening to shoot his wife or that he had gone hunting the day before, both accusations having been made by Amy Farquhar. 4. No strong-arm tactics or deception was used during the questioning by Trooper Eakins. The atmosphere was calm in spite of defendant's nervousness. The defendant was entirely cooperative. 5. The atmosphere was not police-dominated. Again, the interview took place at the defendant's grandmother's house on her porch and in her front yard. It was a one-on- one conversation. No threats or promises were made. The officer was the visitor and could have been told to leave at any time. 6. The defendant was not arrested at the end

of the interview.

All of the above considerations point to the fact that the defendant was not in custody when he was interviewed on Saturday, August 23rd, 2003, at his grandmother's house. However, as the government points out, the tests proposed by the <u>Griffin</u> case are not the ultimate determinatives in reaching a conclusion whether the defendant was or was not in custody. In fact, a much more recent case, <u>United States v. Czichray</u>, 378 F.3d 822 (8th Cir. 2004), was somewhat critical of relying totally on the <u>Griffin</u> factors to reach a conclusion. As the court stated in <u>Czichray</u>, "When the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the ballots and rendering a decision accordingly." The court continued,

> The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest and the court must consider whether the <u>historical facts</u>, as opposed to the one-step-removed <u>Griffin</u> factors, establish custody. The debatable marginal presence of certain judicially-created factors that ostensibly tend to "aggravate the existence of custody" cannot create the functional equivalent of formal arrest where the most important circumstances show its absence.

The court finds that Thomas Farquhar was not in custody when he was interviewed by Trooper Eakins at his grandmother's home on Saturday, August 23rd, 2003.

## <u>Search of Defendant's Truck</u>

It is the defendant's contention, in his memorandum filed after the evidentiary hearing, that since the defendant was in custody at his grandmother's house when he was questioned by Trooper Eakins and was not given the <u>Miranda</u> warnings, the search of his

truck was fruit of the poisonous tree. The defendant states that the search was not valid because it was not voluntary and it flowed from the earlier illegal interrogation. The court has already found that the defendant was not in custody and was not required to be given the <u>Miranda</u> warnings. The court has already reviewed the atmosphere of the interview and finds there was no coercion. The court, therefore, finds that the defendant's consent to searching the truck was voluntary, the search was a valid consent search, the shells found in the truck are admissible and should not be suppressed.

### <u>Interrogation of Defendant at the East Prairie Police Department</u>

The defendant claims as his third point that the interrogation of Thomas Farquhar at the East Prairie Police Department on Sunday, August 24th, 2003, was made without the administration of prior <u>Miranda</u> warnings and, consequently, should be suppressed. The consideration of whether or not the <u>Miranda</u> warnings preceded or did not precede the interview and interrogation of the defendant at the police station in East Prairie involves a consideration of credibility. Both the defendant and his father drove together to the police station at the request of Trooper Eakins. Trooper Eakins had asked Thomas Farquhar to come to the station so "we could get this straightened out." Previously, Thomas Farquhar had been requested to bring the key to the gun safe which his father possessed. Both Thomas Farquhar and his father, William Farquhar, appeared at the police station. Trooper Eakins was not present when they arrived.

Officer Meacham testified clearly, both on direct and on cross-examination, that he administered the <u>Miranda</u> warnings to the defendant before he questioned him. He went

through the procedure which he employed. The defendant consented to the interview and acknowledged the waiver of rights by his signature. William Farquhar testified on the other hand that no Miranda warnings preceded the interrogation of Thomas Farquhar and that it was only after Thomas Farquhar had been interrogated that Trooper Eakins appeared, came into the interview room and told Meacham "Read him his rights. He is going to jail." Here we are faced with contradictory testimony.

Mr. William Farquhar has some consistency and credibility problems. He claimed first that the guns in the gun case were his, contrary to the direct statements of Amy Farquhar and Thomas Farquhar. He claimed he owned the box and the guns in the box. He did explain that there were two gun safes, one on top and one on the bottom. He acknowledged that the defendant and his wife had a key to the top box. However, he said the weapons were in the bottom box, to which he had the only key. He testified that he opened the box. On cross-examination, Mr. William Farquhar repeated that the guns in the gun safe were his and he went on and described each of the guns and then gave brand names for some of them, admitting that the Beretta was his brother's. He claimed that ammunition found in the bedroom was his also, contrary to Amy Farquhar's written statement which said she took a long gun and ammunition out of her husband's vehicle after he had been hunting and brought them into the house.

On cross-examination, Mr. Farquhar testified that a .38 special Smith and Western in the gun safe was his son's. He admitted that all but three guns in the gun safe originally belonged to Thomas Farquhar, but after his conviction, Thomas Farquhar gave the guns to

-18-

William Farquhar because Thomas Farquhar was not to be around any guns following the conviction. William Farquhar stated that the Marlin .22 had been bought by himself. Agent David Diveley of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that the records show that the Marlin .22 caliber rifle was bought by Thomas Farquhar on February 1, 2000. Mr. William Farquhar was then recalled by the defendant and stated that he had messed up, that Thomas Farquhar had bought the Marlin. On recross-examination, William Farquhar was presented with a list and he was asked to tell what guns belonged to Thomas Farquhar before he got in trouble. William Farquhar stated that he could not read or write. Then he proceeded to identify from the list a Remington shotgun, a Smith and Wesson, a Marlin .22 long rifle, a New England fire gun.

Mr. Farquhar had some problems of consistency in that he claimed all the weapons were his, in contradiction to the statements of Amy Farquhar and Thomas Farquhar himself. He claimed the ammunition was his, contrary to the statement of Amy Farquhar. He claimed he had bought the Marlin .22 at Wal-Mart. He claimed he could not read or write and then proceeded to identify the items on the list of weapons.

The court finds his description of Trooper Eakins coming into the middle of an interview and telling the interviewer to read the interviewee his rights, he is going to jail, unbelievable. At all times, on Saturday, August 23rd, 2003, the actions and statements of Trooper Eakins were highly professional. Bursting into and interrupting an interview of a suspect with the statement which William Farquhar claims Eakins made the court finds highly unlikely. Trooper Eakins was not there when the interview started. How would he

have known whether <u>Miranda</u> warnings had been given or not?  When asked by the judge at the evidentiary hearing if Officer Meacham had said anything to him about <u>Miranda</u> warnings, Trooper Eakins responded, "He said he did have the <u>Miranda</u> warning form filled out and signed by Thomas and he told me that later after the interview was concluded – so it was already done before I got there."  This answer appears to support Officer Meacham's statement.  When the court tried to find out if Officer Meacham told him specifically that the <u>Miranda</u> warnings were before or after the interview, Trooper Eakins responded, "He did not tell me that."  Trooper Eakins said, "I presume it was before – but he didn't tell me that."  In the court's mind, the matter of timing of the <u>Miranda</u> warnings was left somewhat ambiguous.

There are problems with Officer Meacham's version of what happened.  The parties are aware that the written statement of Thomas Farquhar titled Voluntary Statement given on Sunday, August 24th, 2003, shows a time of 10:15.  The waiver of rights shows an ending time of 10:23, after the time of the Voluntary Statement.  Officer Meacham stated as an explanation that he had questions prepared ahead of time and read the questions to Thomas Farquhar and wrote the answers and then later typed up the statement introduced at the evidentiary hearing which showed the time of 10:15 and that he mistakenly put down the time of 10:15.  He maintained that he gave the <u>Miranda</u> warnings prior to taking the statement from Thomas Farquhar.

An additional problem presents itself about Officer Meacham's timing.  Toward the end of his direct examination, Trooper Eakins testified that he was not present when Thomas

Farquhar and William Farquhar arrived on Sunday morning at the East Prairie Police Station. He testified, "They had already started the interview – I roughly got there 20 minutes after 10." The time of 10:20 A.M., after the interview had been started, is before the time shown when the giving of the Miranda rights ended, at 10:23 A.M. The waiver sheet shows that Officer Meacham began to administer the Miranda warnings at 10:20 A.M.

The court is not saying that anyone is lying. However, the court does have problems because of the contradictions provided by the written documents and Trooper Eakins's statement with finding when the Miranda warnings were administered.

This does not mean that the defendant's statement given on Sunday, August 24th, 2003, at the East Prairie Police Department should be suppressed. If the defendant was not in custody, then it was not required that Miranda warnings be given before the questioning began. The court finds that Thomas Farquhar at the East Prairie Police Station on Sunday, August 24th, 2003, was not in custody.

William Farquhar testified that he willingly brought the key to the gun safe to the East Prairie Police Station, understanding that the officers were going to open the box up. Mr. Farquhar claimed to have sole possession and control of the box the guns were found in. It was he who opened the box at the police station and that was all right with him. He thought that his son, Thomas Farquhar, willingly gave a statement. He stated that Thomas was not told by the officers that "you've gotta tell us." They did not force him to give a statement. He said the tone of voice that was used during the conversation between Officer Meacham and his son "was getting loud." He meant by that not that the participants were shouting but

that Officer Meacham was louder than when Mr. Farquhar was testifying in court. He said his son was willing to talk to the officer. Mr. Farquhar said his son was not promised anything if he would talk or make a statement. He was not threatened. The officers did not have their guns out. William Farquhar knew the purpose they were going was to the police station was to unlock the gun case. He repeated that he was willing to open the gun safe.

In reviewing the facts, the court does not find an atmosphere "dominated by the police" such as to require the administration of the <u>Miranda</u> warnings. Before Trooper Eakins came, when William Farquhar said there had been no <u>Miranda</u> warnings, but the interview had started, William Farquhar was present with his son. William Farquhar certainly had an interest in protecting his son. He felt that Thomas gave his statement willingly. The mere fact that the interview took place at the East Prairie Police Station does not render the interview custodial. There was never any indication that Thomas Farquhar was under arrest. Earlier this report and recommendation quoted from <u>Thatsaphone v. Weber</u>, which cited the Supreme Court case of <u>Oregon v. Mathiason</u> for the statement that "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house or because the questioned person is one whom the police suspect." 137 F.3d at 1044. The <u>Mathiason</u> case continued that, "<u>Miranda</u> warnings are required only where has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which <u>Miranda</u> by its terms was made applicable, and to which it is limited." <u>Id</u>. at 1045, citing 429 U.S. at 494, 97 S.Ct. at 714. <u>Thatsaphone</u> also quoted from <u>Colorado v. Connelly</u>, to the effect that "Coercive police activity is a necessary

predicate to the finding that a confession is not 'voluntary' within the meaning of the due process clause of the Fourteenth Amendment. 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986)." Id. at 1047. To the same effect, Thatsaphone cited LaRette v. Delo, 44 F.3d 681, 688-89 (8th Cir. (cert. denied 1995)).

The facts of Mathiason are instructive. In that case, the police contacted by phone the defendant who was a suspect in a theft and the defendant and police officer agreed to meet at the police station. The 30-minute meeting took place in a room with the door closed. The officer told the defendant he was not under arrest, but he was suspected of a burglary and his truthfulness might be considered by the prosecutor or judge. No Miranda warnings were given until after the defendant confessed. The State Supreme Court reversed the conviction on the ground that the interrogation took place in a "coercive environment." The United States Supreme Court "summarily reversed." The Eighth Circuit in Thatsaphone provided the reason, "Because defendant came to the brief meeting voluntarily, was not arrested and left without police hindrance, the Court concluded he had not been subjected to custodial interrogation." The same thing is true of Thomas Farquhar's visit to the East Prairie Police Station.

After reviewing Oregon v. Mathiason, the Eighth Circuit found it applicable in Thatsaphone:

> Here, too, Thatsaphone came to the interview voluntarily, was told he was not under arrest, and left without hindrance after a short interview. At the outset, Detective Bailey advised that the interview was voluntary and that Thatsaphone was free to leave. The brief interview was less coercive in nature, and was held in a less coercive environment, than other interrogations

we have held to be non-custodial for <u>Miranda</u> purposes, such as the station-house questioning in <u>Feltrop v. Bowersox</u>, 91 F.3d 1178 (8th Cir. 1996), <u>cert</u> <u>denied</u>, 520 U.S. 1242, 117 S.Ct. 1849, 137 L.Ed.2d 1051 (1997), and in <u>Jenner v. Smith</u>, 982 F.2d 329 (8th Cir.), <u>cert. denied</u>, 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993).

According to the testimony of Mr. William Farquhar, the defendant's father, he and Thomas Farquhar willingly came to the East Prairie Police Station on the Sunday following the seizure of the gun case. William Farquhar turned over the key to the police and the gun case was opened. Trooper Eakins had asked Thomas Farquhar to bring the key to the station the next day. William Farquhar quoted his son, Thomas Farquhar, the defendant, as saying that he was told that he should bring the key to the case to the police station or the gun case would be forced open. In one context, this could be viewed as coercion. In the context of what the officers knew, all the evidence pointed to their right to open the gun case arising from the permission of Mrs. Amy Farquhar. From the officers' viewpoint, the call asking for the key could have been merely a courtesy extended to Thomas Farquhar to avoid damage to the gun case. Such a statement by Eakins is not the "coercion" <u>Miranda</u> sought to prevent as demonstrated by <u>Czichray</u> below.

The only other possible type of coercion involved could have been the questionable statement by Trooper Eakins, according to William Farquhar, when Trooper Eakins is said to have broken into the interview with the direction to Officer Meacham to give him the <u>Miranda</u> warnings because he's going to jail, if that occurred, which the court finds unlikely. In <u>United States v. Czichray</u>, two FBI agents had told a suspect during an interview that if he did not cooperate, the agents would interview his 75-year-old father and others. The

agents further told Czichray that they would "light up his world" and also suggested that if he did not cooperate, then they could use the power of the FBI to pressure insurance companies to withhold payments from his business. The Eighth Circuit commented:

> Czichray argues that "threats" made by the FBI agents should be counted as a factor weighing in favor of custody. We do not believe that informing a suspect that investigation of his alleged fraud will "light up his world" by exposing his activities to his friends, family, and neighbors is a threat that aggravates the existence of custody. See United States v. Martin, 369 F.3d 1046, 1052-53, 1057 (8th Cir. 2004). It is appropriate for an investigator to advise a suspect of the potential course and consequences of a criminal investigation. Suspects frequently confront difficult decisions about whether to defend against potential criminal charges or to pursue resolutions that may ameliorate certain unpleasant consequences.

> * * *

> As we said in LeBrun, "some degree of coercion is part and parcel of the interrogation process and [ ] the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." 363 F.3d at 721.

378 F.3d at 822.

As stated earlier, the court finds that Thomas Farquhar was not in custody when he gave his statement at the East Prairie Police Station on August 24th, 2003. Consequently, the question of at what time the Miranda warnings were given is irrelevant. The defendant's statement is admissible and should not be suppressed.

It will be the court's recommendation that the Motion to Suppress Statements and Motion to Suppress Evidence (Document #16) be denied. (Note-filed as same document)

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Statements

and Motion to Suppress Evidence (Document #16) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

LEWIS M. BLANTON
United States Magistrate Judge

Dated: June 22, 2005